UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
ALLISON ULLO, *individually and on*
*behalf of others similarly situated*,

               Plaintiff,

     --against--

ABY ROSEN, GREGORY POPKIN,
PATRICK HALL, DANE ASERMELY,
SEBASTIEN LEFAVRE, RFR HOLDING
LLC, GPH PARTNERS LLC, GPH
MANAGEMENT LLC, AND GP
SERVICES LLC,

               Defendants.
-------------------------------------------------------X

18 Civ. 11281 (PAE)

 

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE COMPLAINT
<u>AND MOTION TO STRIKE CERTAIN CLASS ALLEGATIONS</u>**

## <u>Table of Contents</u>

**I.   PLAINTIFF'S TEN CLAIMS AND DEFENDANTS' MOTION TO DISMISS** ............. 1

**II.  THE CORPORATE DEFENDANTS ARE EMPLOYERS UNDER THE FLSA** ........... 6

    A.   Supreme Court Decisions on Multiple Employer Liability Under the FLSA ................... 7

    B.   Department of Labor Regulations ................................................................................ 10

    C.   Proving a "Single Employer" Enterprise Gives a Remedy of Veil-Piercing ................... 10

**III. THE INDIVIDUAL DEFENDANTS ARE EMPLOYERS UNDER THE FLSA** .......... 12

    A.   RFR's President and Vice-President of Hotel Operations are Employers ...................... 12

    B.   The General Managers are Employers .......................................................................... 15

**IV. NEW YORK LABOR LAW'S DEFINITION OF EMPLOYED AS "PERMITTED OR SUFFERED"** ................................................................................................................... 15

    A.   New York's First Use of "Permitted or Suffered" in the 19th Century ........................... 16

    B.   Judge Cardozo's Landmark Decision in *Sheffield* ......................................................... 17

    C.   The 1921 Act Defining "Employed" as "Permitted or Suffered" ..................................... 18

    D.   Other Jurisdictions' Interpretation of "Permitted or Suffered" ........................................ 20

    E.   Interpreting "Permitted or Suffered" Under NYLL ......................................................... 21

    F.   Defendants are Employers Under NYLL ........................................................................ 22

**V.  DEFENDANTS' REMAINING ARGUMENT ON THE MOTION TO DISMISS** ....... 22

    A.   The FLSA Claims Against Lefavre Should Be Dismissed ................................................ 22

    B.   Defendants' Request for Advisory Opinion Should Be Rejected ..................................... 23

    C.   GP Services Willfully Violated Section 7434 ................................................................... 24

**VI. DEFENDANTS' MOTION TO STRIKE** ........................................................................ 25

**VII. CONCLUSION** ............................................................................................................. 25

# Table of Authorities

## Cases

*Ashcroft v. Iqbal*, 556 US 662 (2009) ............................................................................... 6

*Boggs v. Blue Diamond Coal*, 590 F. 2d 655 (1979) ....................................................... 17

*Bolling v. PP&G Inc.*, No. 15 Civ. 911, 2015 WL 9255330 (D. Md. Dec. 17, 2015)................. 24

*Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8 (2d Cir. 1984) ............................................. 15

*Commonwealth v. Hong*, 158 N.E. 759 (Mass. 1927) ..................................................... 20

*Coon v. Froment*, 25 App. Div. 250, 49 N. Y. Supp. 305 (1st Dept. 1898) ................................ 19

*Curtis & Gartside Co. v. Pigg*, 134 P. 1125 (Okla. 1913) ................................................. 20

Daly v. Swift & Co., 300 P. 265 (Mont. 1931) ................................................................. 20

*Flores et al v. NYC Pasta and Risotto Co. LLC et al.*, Dkt. #87 (S.D.N.Y. Oct. 16, 2018) ......... 23

*Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481 (2017) ............................................ 23

*Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901 (S.D.N.Y. 2013) ............................ 8

*Herman v. RSR Security Services Ltd.*, 172 F.3d 132 (2d Cir. 1999) ........................... 12, 13

*Hexamer v. Webb*, 101 N.Y. 377, 56 Sickels 377 (1886) .................................................. 17

*Huddleston v. Dwyer*, 322 U.S. 232 (1944) ....................................................................... 16

*In re MTBE*, 517 F. Supp. 2d 662 (S.D.N.Y. 2007) ......................................................... 23

*Inclan v. New York Hosp. Group*, 95 F. Supp. 3d 490 (S.D.N.Y. 2015) ........................... 13

*Irizarry v. Catsimatidis*, 722 F.3d 99 (2d Cir. 2013) ....................................................... 12

*Langston v. Smith*, 630 F. 3d 310 (2d Cir. 2010) ............................................................ 21

*Lopez v. Silverman*, 14 F. Supp. 2d 405 (S.D.N.Y. 1998) ................................................. 9

*Luce v. United States*, 469 U.S. 38, 41 (1984) ................................................................. 23

*Moon v. Kwon*, 248 F. Supp. 2d 201, 236-38 (S.D.N.Y. 2002) ........................................ 10

*Murray v. Miner*, 74 F.3d 402 (2d Cir. 1996) ........................................................... 10, 11

*New York State Dept. of Taxation & Fin.*, 82 N.Y.2d 135 (1993) .................................... 11

*NLRB v. Deena Artware, Inc.*, 361 U.S. 398 (1960) ........................................................ 11

*North Syracuse Cent. School Dist. v. New York State Div. of Human Rights*, 19 N.Y.3d 481 (2012) ........................................................................................................... 16

*Oppenheimer v. Southwest Airlines Co.*, 2013 WL 3149483 (S.D. Cal. June 17, 2013) ............. 11

*People ex rel. Hausauer-Jones Printing Co. v. Zimmerman*, 58 Misc. 264, 109 N.Y.S. 396 (Sup. Ct. 1908) ................................................................................................. 19

*People v. Flanagan*, 66 N.Y. 237 (1876) .......................................................................... 21

*People v. Sheffield Farms-Slawson-Decker Company*, 121 N.E. 474 (N.Y. 1918).... 17, 18, 19, 22

*People v. Taylor*, 192 N.Y. 398 (1908)........................................................................... 18

*Radio and Television Broadcast Tech. v. Broadcast Serv. of Mobile*, 380 U.S. 255 (1965)........ 11

*Spencer v. Board of Educ. of City of Schenectady*, 39 A.D.2d 399 (3d Dep't 1972) ................. 21

*Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114 (2d Cir. 1994) ........................... 16

*Walling v. Rutherford Food Corp.*, 156 F. 2d 513 (10th Cir. 1946)............................... 9

*Zheng v. Liberty Apparel Co.*, 355 F.3d 61 (2d Cir. 2003)........................................ 11

## Federal Statutes

26 U.S.C. § 6053 ...................................................................................................... 25

29 U.S.C. § 152(2)-(3) (NLRA).................................................................................. 10

29 U.S.C. § 203(d) .................................................................................................... 7

29 U.S.C. § 203(e)(1)................................................................................................. 7

29 U.S.C. § 203(g) ............................................................................................... 7, 10

29 U.S.C. § 630(b)- (f) (ADEA) ................................................................................ 10

29 U.S.C. § 652(5)-(6) (OSHA)................................................................................. 10

42 U.S.C. § 12111(4)-(5) (ADA) ............................................................................... 10

42 U.S.C. § 2000e(b)-(f) (Title VII) .......................................................................... 10

## New York Statutes

Act of June 13, 1881, ch. 496, sec. 2, 1881 N.Y. Laws 669...................................... 16
Act of May 18, 1886, ch. 409 sec. 4, 1886 N.Y. Laws 629 ("Factory Inspection Act")............. 16
Chapter 31 of the 1909 Consolidated Laws................................................................ 19
Chapter 50 of the 1921 Consolidated Laws ............................................................ 19, 20
General Construction Law § 110 ............................................................................... 16
N.Y. Lab. Law § 2(6)................................................................................................ 16
N.Y. Lab. Law § 2(7)................................................................................................ 16
N.Y. Stat. § 93........................................................................................................... 21
N.Y. Statutes § 231.................................................................................................... 21
Reprint of Chapter 50 of the 1921 Consolidated Laws in LABOR LAW LEGISLATION OF 1921 (U.S. Bureau of Labor Statistics Miscellaneous Series No. 308 (1922) ........................... 20

## Regulations

29 C.F.R. § 791.2 ...................................................................................................... 10

**Rules**

Fed. R. Civ. P. 12(b)(6)....................................................................................... 6, 23

Fed. R. Civ. P. 12(f) ............................................................................................... 25

Fed. R. Civ. P. 16 ................................................................................................... 23

Fed. R. Civ. P. 23(c) .............................................................................................. 25

Fed. R. Civ. P. 26(f) ............................................................................................... 23

Fed. R. Civ. P. 54(c) .............................................................................................. 11

**Other Authorities**

Alexander A. Tausky, *Legal Aspects of Labor Problems*, ACTIVITIES AND FUNCTION OF A STATE
DEPARTMENT OF LABOR 113 (U.S. Bureau of Labor Statistics Miscellaneous Series No. 479,
(1926) ...................................................................................................................... 18

Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS
(2012)....................................................................................................................... 21

LAW IS JUSTICE: NOTABLE OPINIONS OF MR. JUSTICE CARDOZO
(Abraham L. Sainer, ed., 1938).............................................................................. 18

On April 24, 2019, Plaintiff Allison Ullo filed an Amended Complaint. *See* Dkt. #34 (attached as Exhibit 1). Three weeks later, on May 15, 2019, Defendants elected not to answer and filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) and to strike certain class allegations under Fed. R. Civ. P. 12(f), s*ee* Dkt. #36, and a supporting memorandum of law, *see* Dkt. 37.

Plaintiff respectfully submits this memorandum of law in opposition to these motions.

## I.   PLAINTIFF'S TEN CLAIMS AND DEFENDANTS' MOTION TO DISMISS

From 2009 until 2018, Plaintiff worked at the Gramercy Park Hotel as a cocktail server in the hotel's bar.[1] ¶¶5, 135. Plaintiff alleges that Defendants:

- unlawfully applied a tip-credit to her wages and, therefore, did not pay the required federal and state minimum wage (¶¶129-30, 134, 254, 256),

- failed to give proper notice and wage statements, (¶¶ 247-49, 254), and

- unlawfully required her to give 40-45% of her tips to other people, which was neither reasonable nor customary (¶¶196-97, 239-44).

Based on these factual allegations, Plaintiff has asserted three claims under the Fair Labor Standards Act ("FLSA") and six claims under New York Labor Law ("NYLL") and regulations commonly known as the "Hospitality Wage Order", for a total of nine claims.

Plaintiff brought these labor law claims against the corporate entitles that own and control the hotel: (1) RFR Holdings LLC or "RFR," (2) GPH Partners LLC, and (3) GPH Management LLC. Plaintiffs labor law claims are also brought against certain individuals:

(1) RFR's co-founder, 50% owner and President, Aby Rosen,

(2) RFR's vice-president of hotel operations, Patrick Hall, who oversees the bar, its managers and staff, and

(3) the bar's general manager, who was Sebastien Lefavre until August 2015 and then Dane Asermely beginning in October 2015.

---

[1] There is only a single bar in the hotel, but its two rooms are referred to as "Rose Bar" and "Jade Bar" (these are the colors of the walls in each room). ¶5. The relevant paragraph numbers of the Amended Complaint are cited as ¶__ or ¶¶__.

(For the sake of ease, Lefavre and Asermely are usually referred to as the "general manager" in this memorandum because there was only one general manager of the bar at a time.)

Plaintiff has also sued GP Services LLC, a shell company set up by Rosen and RFR, which issued the checks and W-2s to the bar's staff. Plaintiff brought her federal and state labor law claims against GP Services (in addition to the other three corporate defendants). Plaintiff further alleges that GP Services willfully filed fraudulent W-2s with the IRS. GP Services did not declare employees' cash tips to lower payroll taxes under a policy that began in 2013, and Plaintiff filed one claim under Section 7434 of the Internal Revenue Code against GP Services.

By and large, Defendants do not contest that Plaintiff asserted plausible claims based on the factual allegations in the 297-paragraph complaint. Rather, Defendants confine themselves to four arguments. *First*, Defendants contend that the allegations do not give rise to the plausible inference that any of Defendants "employed" Plaintiff as the term is defined by the FLSA and NYLL. ***See*** **Part II-IV** ***supra***. *Second*, one general manager, Lefavre, alleges that the statute of limitations bar any FLSA claims against him. ***See*** **Part V.A.** ***supra***. *Third*, Defendants argue that there are no allegations that they "willfully" violated the FLSA and, even though this does not result in the dismissal of the FLSA claims, Defendants seek a ruling. ***See*** **Part V.B.** ***supra Fourth***, Defendant GP Services contends that no allegations plausibly show GP Services "willfully" filed the fraudulent W-2s. ***See*** **Part V.C.** ***supra***

## II.    SUMMARY OF FACTUAL ALLEGATIONS

Aby Rosen controls Gramercy Park Hotel personally and through corporate entities formed, owned and controlled by him – RFR, GPH Partners, and GPH Management. The hotel's website states: "For 8 decades, the New York Hotel remained much the same until art collector and real estate developer Aby Rosen took it over." ¶91. RFR's website states: "At the end of

2

2010, RFR became sole proprietor and owner/operator of the renowned, 185-room Gramercy Park Hotel in New York City." ¶20; see also ¶21 (binding concession in court). Rosen is the co-founder, 50% owner and President of RFR. ¶¶17, 48, 57, 78, 80.

RFR states the hotel is an asset of RFR and describes it as an "acquisition milestone." ¶83. RFR describes the hotel's amenities as including the bar and promotes that the bar has the "highest quality" food and drinks. ¶84. RFR provides "Building Information" listing the bar as an amenity and including a contact person, Ben Davidson. ¶¶85-86. Davidson is employed by RFR and is on RFR's Executive Team handling "Hotel Asset Management." ¶¶-87-88. RFR controls two websites that promote the hotel and sells items that use the hotel's registered trademark logo (which is owned by GPH Partners). ¶¶94-96. RFR has asserted copyright ownership over the art at the hotel and the website. ¶96. RFR has answered a legal complaint in state court under name "Rose Bar" after being sued for negligence at the bar. ¶¶22-23.

Aby Rosen and RFR control Gramercy Park Hotel through (1) GPH Partners and (2) GPH Management. The first entity, GPH Partners, owns the lease on the hotel that expires in 2078. ¶103, ¶¶98-109.[2] GPH Partners owns the hotel's domain name and the hotel's website over which it asserts copyright ownership. GPH Partners owns the hotel's trademark, which GPH Partners has registered with USPTO. ¶¶31-33. GPH Partners' website promotes the bar and allows people to book events at the bar and provides information on bar reservations. ¶¶32, 92-93. GPH Partners has answered legal complaints, made discovery demands and settled cases under the trade name of "Gramercy Park Hotel" and "Rose Bar." ¶¶40-43. GPH Partners has filed tax petitions in state court to lower the taxes for the entire hotel property. ¶¶44-47.

---

[2] RFR and GPH Partners have the same address for their corporate office: 390 Park Avenue, 3rd Floor. ¶¶14, 18, 26, 28, 30, 36, 89, 107. Michael Fuch is co-principal of RFR and a "member" of GPH Partners (a "member" is the legal term for an equity owner of a LLC). ¶¶45, 47, 59, 78-79. Frank Mangieri is RFR's Chief Legal Counsel and Vice-President of GPH Partners. ¶¶27-29.

The second entity, GPH Management, owns the hotel's liquor license.[3] ¶58. Three principals are on the license: GPH Partners, Aby Rosen, and Michael Fuchs. ¶59. Under New York law, only GPH Management's employees may handle, dispense or receive payment for alcohol at the hotel. ¶61 GPH Management is also the only entity that may sell alcohol under the trade names "Gramercy Park Hotel," "Gramercy Park Hotel – Jade Bar," and "Gramercy Park Hotel – Rose Bar." ¶¶60, 230. The hotel bar is required to sell food, and GPH Management owns the licenses for serving food in the hotel. ¶¶68, 222.

GPH Management is the only entity that has represented Gramercy Park Hotel before the New York State Liquor Authority ("NYSLA"). GPH Management has appeared multiple times for violating state law. ¶¶62-69. When GPH Management appeared before Community Board Six to seek approval for a DJ to play music and live music, Gramercy Park Hotel's general manager, Peter Yeung, appeared before the Board. ¶¶65-66. GPH Management has also filed tax petitions to lower the taxes for the entire hotel property in years different than GPH Partners. ¶¶70-71. GPH Management owns the hotel's multiple permits from the Fire Department. ¶69.

GPH Partners and GPH Management are inextricably intertwined. Guests book their stay at the hotel on the website owned by GPH Partners. If guests order alcohol in their hotel room, they purchase it from GPH Management. ¶¶33, 58, 60. GPH Management has filed multiple applications with the U.S. government for the entire hotel doing business under the name "Gramercy Park Hotel." ¶¶54-55. Rosemarie Russell-Cole, the human resources director for Plaintiff and the bar staff, has stated on government forms that she works for GPH Management. ¶¶55-57. Russell-Cole administers the hotel's 401k for the hotel employees. ¶¶51-52. Bar staff

---

[3] RFR and GPH Management have listed their address as 2 Lexington Avenue. ¶¶6, 21, 33, 44, 49, 58, 66.

received W-2 forms from Russell-Cole. ¶214. Both GPH Partners and GPH Management have responded to and paid money to the City of New York for building violations. ¶¶35-36, 67.

Rosen hires the bar's general manager and creative director. ¶¶ 162-63. Rosen hired defendant Dane Asermely as the bar's general manager in October 2015. ¶141. Rosen has fired the bar's creative directors or otherwise personally negotiated their severance pay. ¶¶163-64. Rosen personally selects the uniforms worn by the waitresses. ¶¶178-80. Rosen personally requires the waitresses to "put on a uniform that is the character of the space." ¶180.

At staff meetings, the general manager informs the staff about whether Rosen is pleased with their performance and any new bar policies made by Rosen. ¶166. The general manager provides Rosen with monthly, quarterly and yearly reports on bar sales. ¶165. For example, Rosen personally determined such bar policies as upselling bottle service by the cocktail servers, increasing table service, and having the staff promote certain types of liquors. ¶205. After Rosen was upset with low sales numbers at the bar in September 2017, Rosen determined that the bar should become more like another hotel bar controlled by RFR, The Blond. ¶167. Rosen has personally handled multiple major issues concerning the bar with the State Liquor Authority, the City's Department of Health and the New York Police Department. ¶181.

Patrick Hall supervises the various managers and has day-to-day authority over the bar. ¶182-92. Hall is "vice-president of hotel operations for RFR." ¶182. Patrick Hall participated in the hiring or firing of managers and creative directors of the bar including Matthew Green and Luke Blanch. ¶189. Hall lived in the hotel in early 2017, and, at that time, the general manager informed staff to perform their job well as he would be in the bar daily. ¶190. Except for when Aby Rosen makes a policy decision, Patrick Hall has final authority on the bar's policies and determines the conditions of work. ¶191. For example, when a bartender had issues with a

creative director hosting events in the bar, the bartender contacted Hall as the creative director's supervisor. ¶192. Likewise, Hall negotiated and announced events held at the bar at which Plaintiff worked. ¶185. On a weekly if not more frequent basis, the general manager would tell the staff about what "corporate wanted," what "RFR wanted" or what Rosen or Hall had instructed them. ¶204.

The bar is an integral part of the hotel's business. The hotel promotes access to the bar as a guest amenity. ¶117. The hotel's twitter page frequently promotes the bar. ¶34. Guests of the bar use the bathrooms in the hotel's lobby monitored by hotel staff. ¶114. Hotel staff in the hotel's kitchen prepares the food for the bar. ¶118. Hotel security is responsible for the bar and the rest of the hotel. ¶112. From the morning until 5 p.m. when the bar opens, hotel staff maintains the rooms. ¶113. The hotel's guest may use the bar's rooms and the hotel encourages guests to use the rooms by having newspapers for them to read there. ¶113.

Rosen and RFR set up a shell company, GP Services, to pay staff and issue W-2s. ¶113. However, GP Service may not do business in New York. ¶220. Nor can GP Services have employees sell or serve alcohol, or even, food because it does not have the required licenses. ¶221-37. Allowing anyone other then GPH Management's employees to use the alcohol license is a serious violation of the Alcoholic Beverage Control Law and constitutes a danger to the public as it undermines the entire licensing process. ¶234-36.

## II.    THE CORPORATE DEFENDANTS ARE EMPLOYERS UNDER THE FLSA

Plaintiff's allegations support the plausible inference that defendants "employed" Plaintiff and were her "employers."[4] Under the FLSA, "employ" includes the ordinary definition

---

[4] The plausibility standard required under Fed. R. Civ. P. 12(b)(6) is now well known. *See Ashcroft v. Iqbal*, 556 US 662, 678 (2009). The question is whether, when reading all of the factual allegations in the Amended Complaint in the light most favorable to Plaintiff, the facts give rise to plausible claims that after discovery Plaintiff could be entitled to relief.

of employ such as a formal agreement but also "includes to **suffer or permit** to work." 29 U.S.C. § 203(g) (emphasis added). An "employee" is "any individual **employed** by an employer," *id.* § 203(e)(1) (emphasis added), and an "employer" includes "any person acting **directly or indirectly in the interest** of an employer **in relation to an employee**," *id.* § 203(d) (emphasis added). As explained below, multiple corporations may be held liable under the FLSA.

### A. Supreme Court Decisions on Multiple Employer Liability Under the FLSA

In *Falk v. Brennan*, 414 U.S. 190 (1973), the Supreme Court held maintenance workers for apartment complexes had multiple employers. The complexes' owners hired Drucker & Falk ("D&F"). "Under its contracts with the apartment owners," D&F agreed to "perform, on behalf of each owner and under [its] nominal supervision, virtually all management functions that are ordinarily required for the proper functioning of an apartment complex." *Id.* at 192.

Just as the owners and D&F were both employers in *Falk*, the owner of Gramercy Park Hotel and companies operating the hotel are employers. *Falk* also held "it is clear that the maintenance workers are employees of the building owners." *Id.* at 195. It is equally clear that RFR, the hotel's owner, is an employer. This is particularly true because RFR's vice-president of hotel operations supervises the bar's general manager and the bar staff, and RFR's President determines the policy that affects the terms and conditions of workers' employment. The fact that RFR states it is "sole proprietor and owner/operator of the renowned, 185-room Gramercy Park Hotel in New York City" should be the end of the discussion. ¶20.

It makes no legal difference that RFR owns the hotel lease through GPH Partners for the purposes of determining employer liability under the FLSA. Liability in *Falk* could not be escaped if the defendants had merely made more corporate layers between the legal entity that

owned the property and the employees. Courts look at the underlying "economic reality" rather than technical legal concepts. *See Goldberg v. Whitaker House Coop.*, 366 U.S. 28, 33 (1961).

GPH Management is an employer of the bar's staff. From its name alone, this Court could draw a plausible conclusion that it manages the hotel including the bar. In *Falk*, the Court held: "In view of the expansiveness of the Act's definition of 'employer' and the extent of D & F's managerial responsibilities at each of the buildings, which gave it substantial control of the terms and conditions of the work of these employees, we hold that D & F is, under the statutory definition, an employer' of the maintenance workers." 414 U.S. at 195.

GPH Management exercised control over the bar's staff for the simple reason that when a corporate officer or manager acts, their actions are attributed to their corporate entity. *See United States v Dotterweich*, 320 U.S. 277, 281 (1943); *see also Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 942 (S.D.N.Y. 2013). Rosemarie Russell-Cole is the HR director for the bar staff. In fact, Russell-Cole and Hall removed Plaintiff from work schedule (demonstrating her authority of the bar). ¶184. Rosemarie-Cole works for GPH Management. ¶¶55-57.

*Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947) provides another example of how the Supreme Court looks at the economic reality, not the legal doctrine of corporate entities. Rutherford Food Corporation employed people to remove meat from the bones of cattle carcasses. *Id.* at 724-25. The meat boners "did a specialty job on the production line" and worked in one room within a much larger building. *Id.* at 726, 730. Rutherford hired and fired them, set their hours, and paid them. *Id.* at 726, 730. Obviously, Rutherford was their employer under any traditional definition of "employ."

Kaiser Packing Company owned the plant and had entered into a contract with Rutherford. The contract had a wholly legitimate business purpose.[5] "The record revealed that the boners owned their own tools [and] Kaiser never attempted to directly control their hours." *Lopez v. Silverman*, 14 F. Supp. 2d 405, 416 (S.D.N.Y. 1998). Rutherford and Kaiser were owned by seperate individuals. Rutherford and Kaiser had a separate corporate structure with separate officers. Rutherford's workers merely did a discrete job in a separate room. *Id.* at 730.

Despite all these facts, Kaiser was also an employer under FLSA. "The managing official of the plant kept close touch on the operation." *Id.* Rutherford's employees also used Kaiser's premises and some of their equipment. *Id.* "Upon the whole, we must conclude that these meat boners were employees of the slaughtering plant under the Fair Labor Standards Act." *Id.*

The economic reality is that Plaintiff worked in a hotel wholly controlled by RFR, which set up two LLCs through which it owned and operated the hotel. The bar's employees were using premises leased by GPH Partners, operated by RFR, and relying on GPH Management's liquor license. RFR's corporate officers, Rosen and Hall, supervised the bar's staff. GPH Management's employee, Rosemarie Russell-Cole, was the bar's HR Director.

Plaintiff's allegations are more than sufficient to give rise to a plausible allegation that the corporate defendants were "joint employers" so that Plaintiff may use the traditional tools of discovery to gather evidence. Plaintiff's work benefited not just the bar but also the hotel as a whole. All three legal entities were joint employers of the bar's staff including Plaintiff.

---

[5] The trial court in *Rutherford* had found "that the contracts with Reed and his successors were not sham and deceptive arrangements, but were necessitated by the exigencies of the situation confronting Kaiser when it entered into the contract with Reed." *Walling v. Rutherford Food Corp.*, 156 F. 2d 513, 518 (10th Cir. 1946); *see also Barfield*, 537 F.3d 132, at 143. (a sham arrangement is not required in order to find joint employer status).

### B. Department of Labor Regulations

The Department of Labor has issued regulations determining when multiple companies are liable as employers. *See* 29 C.F.R. § 791.2. Under these regulations, RFR, GPH Partners and GPH Management are joint employers because the bar staff performs work which simultaneously benefits all three of them. 29 C.F.R. § 791.2(b). Separately, GPH Partners, GPH Management, and GP Services are joint employers with RFR because RFR controls them as the "sole proprietor and owner/operator" of the hotel. ¶20. S*ee Moon v. Kwon*, 248 F. Supp. 2d 201, 236-38 (S.D.N.Y. 2002) (Lynch, J.) (applying § 791.2(a) to hotel and its corporate officers).

### C. Proving a "Single Employer" Enterprise Gives a Remedy of Veil-Piercing

Among federal statutes, only the FLSA defines "employ" as including "to suffer or permit to work." 29 U.S.C. § 203(g). Other federal statutes define employer liability in direct or indirect relationship to "employed" or employer.[6] Only the FLSA has joint employer liability.

However, *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996), held federal courts will apply "the single employer doctrine, which treats two nominally independent enterprises as a single employer, in order to protect the collective bargaining rights of employees and to advance industrial stability." *Id.* at 404. This is a "***veil-piercing doctrine***." *Id.* at 405 (emphasis added). "Under the doctrine of limited liability, a corporate entity is liable for the acts of a separate, related entity only under extraordinary circumstances, commonly referred to as piercing the corporate veil." *Id.*

---

[6] *See* Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b)-(f) ("The term 'employee' means an individual employed by an employer . . . ."); Americans with Disabilities Act, 42 U.S.C. § 12111(4)-(5); Age Discrimination in Employment Act, 29 U.S.C. § 630(b)- (f); National Labor Relations Act, 29 U.S.C. § 152(2)-(3); Occupational Safety and Health Act, 29 U.S.C. § 652(5)-(6).

The Supreme Court has recognized this veil-piercing doctrine as it originated with the NLRB. *See Radio and Television Broadcast Tech. v. Broadcast Serv. of Mobile*, 380 U.S. 255, 256 (1965); *NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 402 (1960). But as *Rutherford* and *Falk* make clear, the doctrine for "single employer" veil-piercing is not the standard for "joint employer" liability under the FLSA. *See Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 70 (2d Cir. 2003) ("*Rutherford* was a joint employment case").

"Although no one factor is determinative," the Second Circuit has held that "control of labor relations is the central concern." It is plausible that RFR controls all three entities. *Murray*, 74 F.3d at 404. After trial, Plaintiff expects that this Court will enter an order, as a remedy, piercing the corporate veil. But this is a separate from whether Defendants are "joint employers."

Finally, the New York Court of Appeals has held: "Piercing of the corporate veil is not a cause of action independent of that against the corporation" but rather relief ordered by the Court. *New York State Dept. of Taxation & Fin.*, 82 N.Y.2d 135, 141 (1993). Because a "12(b)(6) motion to dismiss challenges the legal sufficiency of the pleadings, not the appropriateness of the relief sought," a motion to dismiss is not the proper mechanism to challenge a Plaintiff's prayer for relief to pierce the corporate veil. *Oppenheimer v. Southwest Airlines Co.*, 2013 WL 3149483, *3 (S.D. Cal. June 17, 2013) (citing *Cohen v. Office Depot, Inc.*, 184 F.3d 1292, 1297 (11th Cir. 1999). As Rule 54(c) states, "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c). It would make no sense to require allegations supporting relief when such relief can – and should – be awarded even if never pleaded in the complaint.

III.     **THE INDIVIDUAL DEFENDANTS ARE EMPLOYERS UNDER THE FLSA**

Unlike most other employment-related laws, the FLSA holds individuals personally liable even where there is a corporation establishing limited liability. In determining whether individuals are liable as "employers," the Second Circuit has "identified different sets of relevant factors based on the factual challenges posed by particular cases." *Irizarry v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2013). One test, which tends to apply to corporate officers and owners of a company, is whether the defendant has "operational control" – that is, "authority over management, supervision, and oversight of" the company. *Id.* Another test, which tends to apply to managers, is whether the defendant has "direct control" over the employees. *Id.* at 111.[7]

A.     **RFR's President and Vice-President of Hotel Operations are Employers**

Two Second Circuit cases show why it is more than plausible that Rosen and Hall are employers. The first case is *Herman v. RSR Security Services Ltd.*, 172 F.3d 132 (2d Cir. 1999) ("*RSR*"). *RSR* involved a security service company. One 50% owner, Murray Portnoy, was an attorney. He had no expertise in security services. The other 50% owner was Michael Stern. "Michael Stern managed the security guard operations. He hired and fired guards, set the rates for their services, assigned them to job locations, monitored their performance, prepared the payroll, and maintained the company's files." *Id.* Obviously, Stern was an employer.

The Second Circuit found Portnoy was also an employer. "Although Portnoy exercised broad authority over RSR operations while working out of the Westbury office, he was not directly involved in the daily supervision of the security guards." *Id.* at 136. Several senior managers reported to, and took occasional instruction from, Portnoy. Portnoy was "viewed by

---

[7] These are ***non-exclusive*** factors and there are other tests. *See, e.g.*, *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058-59 (2d Cir. 1988) (five factor test); *Zavala v. Wal–Mart Stores, Inc.*, 393 F. Supp. 2d 295, 329–30, n.26 (D.N.J.2005) (various factors used by in the federal circuits).

others as having control over RSR"; he represented himself . . . as having such authority"; and he dominated the company in part because his access to bank credit permitted him to "exercise financial control." 172 F.3d at 136-37 (alternations omitted).

*Irizarry* further demonstrates plausibility in this case. *Irizarry* held the President of the Gristedes supermarket chain, Catsimatidis could be found by a jury to be an employer for FLSA purposes. 722 F.3d at 103-18 (reversing District Court's grant of summary judgment). Catsimatidis hired managerial employees, had the power to close or sell Gristede's stores, and routinely reviewed financial reports. Judge Buchwald has explained:

> [T]he Circuit noted that Catsimatidis was a hand's-on executive involved in Gristede's "banking," "financial[s]," "real estate," "merchandising," "governmental relations," and "relationships with vendors," *id.* at 112, and who both held and exercised the ultimate power "to control Gristede's operations at a high level," *id.* at 113 n.7. Furthermore, "[a]lthough Catsimatidis did not exercise managerial control in stores on the day-to-day level of a manager ... he exercised influence in specific stores on multiple occasions." *Id.* at 113. Catsimatidis made regular check-ups on Gristede's stores, and from time to time he would "address problems that occurred in individual stores." *Id.*

*Inclan v. New York Hosp. Group*, 95 F. Supp. 3d 490, 508-509 (S.DN.Y. 2015). "Catsimatidis had functional control over the enterprise as a whole." *Id.* at 116.

In this case, Rosen hired the bar's general manager including Asermely. ¶¶ ¶141, 162-63. Rosen has hired and fired the bar's creative directors and negotiated their severance pay. ¶¶163-64. Rosen even selects the uniforms worn by the waitresses -- an allegation that by itself shows he determines the nature or conditions of their employment. ¶¶178-80).

Rosen sets the bar's policies and reviews it's performance; any instructions he has for the bar staff are conveyed at meetings by the general manager.[8] ¶166. Rosen personally determined

---

[8] The instructions at the meetings are attributable to Rosen under fundamental and long-standing legal doctrine. *See United States v. Gooding*, 25 U.S. (12 Wheat.) 460, 471-72 (1827) (Story, J.)

to upsell bottle service, increase table service, and promote certain types of liquors. ¶205. Rosen personally determined that the bar should become like another hotel bar, The Blond. ¶167. Rosen personally handled issues related to the bar with the State Liquor Authority, the Department of Health and the New York Police Department. ¶181. All of these decisions affected the nature and conditions of Plaintiff's employment. Additionally, Rosen receives monthly, quarterly and yearly financial reports from the general managers. ¶165. He has overall financial control of the company.

Rosen is an employer under the FLSA. *See, e.g.*, *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 972 (5th Cir. 1984) (finding a president of hotel corporations liable as employer when he formed the companies, held the purse strings, guided policy, selected managers, and solved major problems); *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 966 (6th Cir. 1991) (holding that the "top man" that controls the "purse strings" was "employer").

Patrick Hall supervises the general manager and creative director (*i.e.*, managerial employees). Hall is a Vice-President of RFR. For example, if a bartender has issues with a creative director, the bartender will contact Hall as the creative director's supervisor. ¶192. During Plaintiff's employment, Hall negotiated and announced events held at the bar. ¶185. Except for when Aby Rosen made a policy decision, Patrick Hall had final authority on the bar's policies and determined the conditions of work. ¶191. On a weekly, if not more frequent basis, the general manager told the staff about what Patrick Hall or Aby Rosen had told them to do in the bar or had otherwise approved. ¶204. Finally, Hall had the power to fire. He removed Plaintiff from the bar's schedule, an event that Defense Counsel characterizes as "firing" her.

---

("If done by others under the command and direction of the owner, with his approbation and for his benefit, it is just as much in contemplation of law his own act, as if done by himself. To this extent, at least, the maxim may be safely applied, *qui facit per alium, facit per se*. And it cannot be material whether it be done in his absence from, or his presence in, the scene.").

This is the act of an employer. *See Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961) (finding liability because "management, in other words, can hire or fire the homeworkers."); *Falk v. Brennan*, 414 U.S. 190, 195 (1973) (holding that "managerial responsibilities" and "substantial control of the terms and conditions of the [employer's] work" create statutory employer status).

### B.     The General Managers are Employers

The general manager is an employer even under the strictest test. See *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)). The general manager had the power to hire and fire the bars' employees. ¶199; *see also* ¶200 (four specific examples); ¶207 (suspend employees if they violate bar policy). The general manager supervised and controlled employee work schedules and the conditions of employment. "On a daily basis, [the general manager] instructed bartenders and cocktail servers on all manner of work in the bars and approved the schedules of all employees and either sent out the schedule or had a floor manager send out the schedule via email." ¶201; *see also* ¶202 (specific example). The general managers determined how staff would be paid by enforcing the policy that waitresses would give 40-45% of their tips to other bar staff. The general managers enforced RFR's policy that cash tips not be declared. ¶207, ¶¶209-17. The general manager maintained and reviewed employment records including staff's paperwork. ¶¶206, 208. Finally, the general manager "regularly produced financial records of the Rose Bar and Jade Bar including monthly, quarterly and annual profit/loss statements that included Plaintiff's and other employees' wages." ¶206.

## IV.     NEW YORK LABOR LAW'S DEFINITION OF EMPLOYED AS "PERMITTED OR SUFFERED"

"It is the duty of the federal appellate courts, as well as the trial court, to ascertain and apply the state law where, as in this case, it controls decision." *Huddleston v. Dwyer*, 322 U.S.

232, 236 (1944). Thus, this Court must predict how the highest court of New York would interpret "permitted or suffered" as used in Section 2(7) of New York Labor Law and give the "fullest weight" to the opinions of the New York Court of Appeals. *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994). Opinions from other jurisdictions should also be considered. *See id*. Finally, the New York legislature has codified the statutory rules of interpretation, which this Court must follow when interpreting a New York statute. *See* General Construction Law § 110; *see also North Syracuse Cent. School Dist. v. New York State Div. of Human Rights*, 19 N.Y.3d 481, 490 (2012).

### A.  New York's First Use of "Permitted or Suffered" in the 19th Century

The starting point for interpreting New York Labor Law is the text of the statute. Section 2 provides, "'Employed' includes permitted or suffered to work." N.Y. Lab. Law § 2(7). "Permitted or suffered" is a term of art used in labor laws beginning at the end of the 19th century. A company or person that has "employed" another person under Section 2(7) is an "employer", but Section 2 further provides that an "employer" includes any "owner, proprietor, agent, superintendent, foreman or other subordinate." N.Y. Lab. Law § 2(6).

In 1886, New York first used "suffer or permit" to impose civil liability for violating labor laws in the manufacturing industry. S*ee* Act of May 18, 1886, ch. 409 sec. 4, 1886 N.Y. Laws 629, 629 ("Factory Inspection Act") (regulating businesses where "women under twenty-one, and youths under eighteen years of age" are "***required, permitted or suffered*** to work more than ten hours in any one day, in a manufacturing establishment . . . .") (emphasis added); *see also* Act of June 13, 1881, ch. 496, sec. 2, 1881 N.Y. Laws 669, 669 (first use of "suffer or permit" in criminal statute).

New York used the phrase "permitted or suffered" to override "master-servant" doctrines of common law. Three months earlier, in February 1886, the Court of Appeals had held that a hotel was not liable under the "master and servant" doctrine for another company's acts on its property as it was an "independent contractor" even when the hotel retained the power of general supervision to see that the over-all work was correctly done and had coordinated several companies on the site. *See Hexamer v. Webb*, 101 N.Y. 377, 56 Sickels 377 (1886). Statutes using "permitted or suffered" also eliminated the "so-called 'unholy trinity' of judicially-created employer defenses, assumption of the risk, contributory negligence and the fellow servant rule" that "were developed and strictly enforced as legal rules in the last half of the nineteenth century." *Boggs v. Blue Diamond Coal*, 590 F. 2d 655, 658 (1979).

### B.      Judge Cardozo's Landmark Decision in *Sheffield*

After 1918, the leading case in New York, and the United States, on employer liability, was *People v. Sheffield Farms-Slawson-Decker Company*, 121 N.E. 474, 476 (N.Y. 1918). Authored by then-Chief Judge Cardozo, the court held that a milk company had violated a state statute when one of its 125 milk deliverers hired a minor to guard a truck during a delivery. Companies "must neither create nor suffer" the conditions prohibited by the statute. *Id.* at 476.

Judge Cardozo famously held, "Sufferance as here prohibited implies knowledge or the opportunity through reasonable diligence to acquire knowledge." *Id.* at 476. The court concluded "that ***the omission to discover and prevent was a sufferance of the work***; and that for the resulting violation of the statute, a fine was properly imposed." *Id.* at 477 (emphasis added). The appellate court below explained, "The basis of liability is the owner's failure to perform the duty of seeing to it that the prohibited condition does not exist." *People ex rel. Price v. Sheffield Farms-Slawson-Decker Co.*, 167 N.Y.S. 958, 961 (App. Div. 1917).

*Sheffield* was a landmark labor law decision. *See* Alexander A. Tausky, *Legal Aspects of Labor Problems*, ACTIVITIES AND FUNCTION OF A STATE DEPARTMENT OF LABOR 113, 117 (U.S. Bureau of Labor Statistics Miscellaneous Series No. 479, 1926) ("Judge Cardozo, writing in a lengthy and instructive opinion in which he very lucidly explains the law relative to the prohibition and violation of the law under a statute of this kind"); *see also id.* at 117-18 (quoting *Sheffield* extensively) (authored by Assistant U.S. Attorney General in charge of the Labor Bureau). It was also regarded as one of Judge Cardozo's most notable decisions even in 1938. *See* LAW IS JUSTICE: NOTABLE OPINIONS OF MR. JUSTICE CARDOZO at 35-39 (Abraham L. Sainer, ed., 1938) (reprinting *Sheffield*).[9]

## C.     The 1921 Act Defining "Employed" as "Permitted or Suffered"

*Sheffield* was, and is, a seminal decision. New York Labor Law imposes a non-delegable duty upon businesses to exercise reasonable diligence and make reasonable inquiries even if they do not "employ" a person. A violation of this duty means the business "suffered" the unlawful act and violated the state's labor laws. The decision was subject to two criticisms, however.

The first criticism is that the statute only used the phrase "employed or permitted to work." *Sheffield*, 225 N.Y. at 27 (quoting Section 162 of Chapter 31 of the Consolidated Laws of 1909, the chapter known as New York's "Labor Law"). In fact, while Judge Cardozo acknowledged the word "suffered" was missing, the criticism could have been more severe. In 1909, the legislature removed the word "suffered" from the statute.[10] The Court of Appeals still

---

[9] The forward for LAW IS JUSTICE was written by Robert F. Wagner, United States Senator from New York. The same year the book was published, Senator Wagner sponsored the introduction of the Fair Labor Standards Act of 1938.

[10] The passage of Chapter 31 in 1909 may have been a reaction to *People v. Taylor*, 192 N.Y. 398 (1908), which stated (arguably in *dicta*) that a labor law statute that provided no child under fourteen "shall be employed, permitted or suffered to work" in any factor was "not malum in se but malum prohibited." *Id.* at 400. "The owner, by or for whom the child is employed in

held "the statute draws no distinction between sufferance and permission." *Id.* at 31. "The two words are used indiscriminately. In such circumstances, each may take some little color from the other." *Id.* "Permit" includes "suffer."

The second criticism is that prior to the passage of Chapter 31 of the 1909 Consolidated Laws, New York courts had held that "permit" was not the same as "suffer." In *Coons v. Froment*, the appellate court had held that "permit" could have two meaning:

> While it is true that the verb "to permit" is, in one sense, synonymous with "to suffer," "to allow," or "to let," it also is equivalent to "to give leave," "to license," "to warrant in writing," "to grant," "to empower," "to authorize," "to sanction" . . . .

25 App. Div. 250, 252-53, 49 N. Y. Supp. 305, 306 (1st Dept. 1898); *People ex rel. Hausauer-Jones Printing Co. v. Zimmerman*, 58 Misc. 264, 268 109 N.Y.S. 396, 398-99 (Sup. Ct. 1908) (interpreting New York labor law statute as requiring intent or knowledge).

In fact, just before Judge Cardozo joined the highest court in 1917, the Court of Appeals affirmed a lower court ruling that "permitted" necessitates knowledge under the state's Labor Law (although without a written opinion). *See MacFarlane v. Mosier & Summers*, 79 Misc. 460, 141 N.Y.S. 143 (Sup. Ct. 1913) ("Thus knowledge and an active operation of the mind are required, and the passive happening of the event is not enough to charge the consequence upon the contractor.") *aff'd* 143 N.Y.S. 221 (4th Dep't 1913), *aff'd* 215 N.Y. 727 (1915).

*Sheffield*'s interpretation never faced criticism. Three years later, the New York legislature ended any debate concerning "permitted" versus "permitted or suffered" by enacting a new codification of labor law with Chapter 50 of the Consolidated Laws of 1921. *See Labor Law*

---

violation of the statute, is liable, because such employment is prohibited. The question of intent is immaterial." *Taylor* seems to impose strict liability, which was rejected in *Sheffield* as the court imposed a negligence standard (i.e., reasonable inquiry and the power to prevent).

*of New York*, LABOR LAW LEGISLATION OF 1921 at 145-91 (U.S. Bureau of Labor Statistics Miscellaneous Series No. 308 (1922) (reprinting Chapter 50, New York's new labor law).

Section 1 provides "This chapter shall be known as the "Labor Law.'" *Id.* at 145. Immediately thereafter, Section 2, "Whenever used in this chapter....'Employed' includes permitted or suffered to work.'" *Id.* at 146. The legislature has amended the definitions many times but the definition of "employ" has remained the same for a century.

**D.      Other Jurisdictions' Interpretation of "Permitted or Suffered"**

States used "employ, permit or suffer," or some variation thereof, to impose liability for violations of labor law. The highest courts of these jurisdictions have interpreted "permit or suffer" to impose liability on a person who negligently fails to prevent the statute's violation. For example, in *Curtis & Gartside Co. v. Pigg*, 134 P. 1125 (Okla. 1913), the Oklahoma Supreme Court held "each of the terms, 'employed,' 'permitted,' and 'suffered,' is given a distinct office in the general plan of prohibition." *Id. at 1130*. Regarding imposing liability for having "suffered" an unlawful act, the court held: "The master's liability arises from a negligent failure to discharge his duty under the statute." *Id.* at 1130; *see also Commonwealth v. Hong*, 158 N.E. 759, 759–60 (Mass. 1927); *Daly v. Swift & Co.*,, 300 P. 265, 268 (Mont. 1931).

A recent decision by the highest court of California is instructive and should be followed. *See Martinez v. Combs*, 49 Cal.4th 35, 69 (2010). "The verbs 'to suffer' and 'to permit,' as we have seen, are terms of art in employment law." *Id.* at 64. Along with an extensive discussion of the origins of the phrase, the court concluded "the basis of liability is the defendant's knowledge of and failure to prevent the work from occurring." *Id.* at 70 (quoting *Sheffield*).[11]

---

[11] The FLSA was not even the first federal statute to impose liability with the phrase "permitted or suffered." See Act of July 20, 1868, ch. 186, §44, 15 Stat. 125, 143 (1868) (now codified at 26 U.S.C. § 5615(3)(E) (post-Civil War revenue law using "permitted or suffered for liability); *see*

E.       Interpreting "Permitted or Suffered" Under NYLL

This Court should predict that the New York Court of Appeals will interpret "permitted or suffered" to mean that employer liability extends to a business or person that fails make a reasonable inquiry and to prevent statute's violation for three reasons. *First*, "[i]n the construction of a statute, meaning and effect should be given to all its language, if possible, and words are not to be rejected as superfluous when it is practicable to give to each a distinct and separate meaning." N.Y. Statutes § 231; *see also Langston v. Smith*, 630 F. 3d 310, 315 (2d Cir. 2010) (relying on § 231). Employ, permit, and suffer should all be given meaning.

*Second*, "it is the intention of the Legislature at the time the various statutes took effect that controls," *Spencer v. Board of Educ. of City of Schenectady*, 39 A.D.2d 399, 402 (3d Dep't 1972), because the legislature has directed courts to interpret a statute according "as of the time it took effect." N.Y. Stat. § 93. This is a rule of interpretation that has deep roots in New York jurisprudence. *See, e.g.*, *People v. Flanagan*, 66 N.Y. 237, 237 (1876). "Words must be given the meaning they had when the text was adopted." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 78 (2012).

The phrase "permit or suffer" had a specific meaning in 1921, when the legislature repealed Chapter 31 and enacted Chapter 50. New York Labor Law should be thus interpreted. *See* Bruce Goldstein, et al., *Enforcing Fair Labor Standards in the Modern American Sweatshop: Rediscovering the Statutory Definition of Employment*, 46 UCLA L. Rev. 983, 1028-39 (1999) (extensive discussion of the meaning and history of "permit or suffer").

---

*also United States v. One Copper Still*, 8 Biss. 270 (E.D. Wisc. 1878) (holding property was forfeited under the statute, then codified in the Revised Statutes, despite lack of knowledge of illegal conduct because the defendant "permitted or suffered" the illegal act).

*Third, Sheffield* still controls. New York courts follow *Sheffield* as does the Second Circuit. *See, e.g.*, *Alix v. Wal-Mart Stores, Inc.*, 16 Misc. 3d 844, 855, 838 N.Y.S.2d 885, 894 (Sup. Ct. 2007); *Property Clerk, N.Y. City Police Dept. v. Pagano*, 170 A.D.2d 30, 35, 573 N.Y.S.2d 658 (1st Dept. 1991). *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 78 (2d Cir. 2003) (relying on *Sheffield* to determine the scope of liability).

### F.    Defendants are Employers Under NYLL

The corporate defendants and individual defendants are employers of Plaintiff because they permitted or suffered her work. A reasonable inquiry into her work would have revealed the violations of state law and each individual defendant had the power, under the positions that they held, to stop the violations from occurring: RFR President, RFR Vice-President of Hotel Operations and the bar's general manager.[12] The same is true of the corporate entities. Their agents had the ability to conduct a reasonable inquiry into the bar staff's employment and prevent any violation. Or, at the very least, the allegations give rise to a plausible inference that all of this is true, which is all that is required at this early stage.

## V.    DEFENDANTS' REMAINING ARGUMENT ON THE MOTION TO DISMISS

### A.  The FLSA Claims Against Lefavre Should Be Dismissed

Lefavre argues that he is not liable for damages after he stopped working at the bar. He is correct. The Court may not award damages to Plaintiff for violations of the FLSA by Lefavre because he left more than three years before the complaint was filed. Plaintiff may only bring

---

[12] The power and authority of individual defendants in their job or that corporate agents possess is important to emphasize under this standard. Even high-ranking employees may not be in a position to know investigate. Such employees are not liable. An emphasis on the power to discover and stop the violation also explains why one does not become an "employer" even when one hires a company to perform a job even on one's property.

state claims against him because NYLL has a six-yea statute of limitation, and Plaintiff erred in including claims two, three and four, ¶¶265-78, against Lefavre.[13]

## B. Defendants' Request for Advisory Opinion Should Be Rejected

The remaining defendants (all but Lefavre) move for this Court to declare Plaintiff's allegations do not give a plausible inference that they "willfully" violated the FLSA. However, Defendants concede the FLSA claims will survive regardless as all of the FLSA claims are still timely. Defendants' request should be rejected because the Court only has the power under Rule 12(b)(6) to dismiss **claims**, *see, e.g.*, *In re MTBE*, 517 F. Supp. 2d 662, 666 (S.D.N.Y. 2007), rather than make preliminary decisions on various aspects of the case.

There are several procedural vehicles may use or times that Defendants may raise issues concerning willfulness: the conference held under Fed. R. Civ. P. 26(f), a motion to limit or modify discovery under Rule 16, or a motion *in limine* under the "district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984).

In fact, the trier of fact may never even decide "willfulness" if the damages under the state claims exceed the damages under the FLSA. *See* note 14 *infra*; *see also Flores et al v. NYC Pasta and Risotto Co. LLC et al.*, Dkt. #87 at 98 (S.D.N.Y. Oct. 16, 2018) (Plaintiff's attorney agreeing that jury need not make a finding of willfulness because NYLL damages are greater than FLSA damages). In other words, at this rather preliminary stage of the proceeding, Defendants are seeking what is an advisory decision.

---

[13] However, as a practical matter, this error has no impact. *See Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 498 n.7 (2017) (Failla, J.) (limiting damages to the NYLL claims because "as far as the quantum of damages is concerned, Plaintiffs will recover under the NYLL alone.").

In any event, the purpose of Rule 12(b)(6) is to test the legal sufficiency of the claims in the complaint, and Defendants concede that Plaintiff has properly stated the FLSA claims against them (with the exception of Lefavre). There is nothing to dismiss.

### C.  GP Services Willfully Violated Section 7434

GP Services agues that the allegations against it do not plausibly show it "willfully" filed fraudulent W-2s. Section 7434 states: "If any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return." 26 U.S.C. § 7434(a). "A Form W-2 is an 'information return.'" *Bolling v. PP&G Inc.*, No. 15 Civ. 911, 2015 WL 9255330, at *6 n.24 (D. Md. Dec. 17, 2015).

Plaintiff alleges that beginning in July 2013, RFR and the bar's general manager instituted a policy of not declaring the employees' cash tips and, as a result, "Plaintiff's W-2 forms that Plaintiff received from Rosemarie Russell-Cole . . . only reflected tips from credit cards and failed to include any cash tips that had been received and reported by the employees." ¶214. GP Services LLC concedes, as it must, that Plaintiff properly alleged GP Services LLC filed fraudulent W-2s. Under Rule 9(b) Plaintiff must merely plead the "who, what, when, why, and how" of the fraud. *Bolling*, 2015 WL 9255330 at *6 (holding that Plaintiff properly a violation of Section 7434). Just as in *Bolling*, Plaintiffs identify the "who" (GP Services), "what" (false Form W-2s), "when" (every year of employment since 2013), "why" (to gain reduce payroll taxes), and "how" (underreporting the Plaintiffs' income by not including cash tips). Plaintiff has thus properly alleged fraud with particularity—a fact that GP Services concedes.

The Court may also plausibly concluded that GP Services filed willfully – as opposed to negligently or by accident – because the W-2s were fraudulent due to a corporate policy. GP

Services intentionally did not report these earnings, as it was required to do by law (*see, e.g.*, 26 U.S.C. § 6053) so as to reduce payroll taxes. These factual allegations plausibly suggest GP Services willfully filed the fraudulent document.

## VI.   DEFENDANTS' MOTION TO STRIKE

Defendants also move to strike class allegations with respect to two of the FSLA claims. The Court should deny the motion under the plain language of Rule 12(f), which only allows the Court to strike from a pleading "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Plaintiffs' allegations on class certification are a far cry from such matter. Moreover, it is impossible to strike allegations – thus removing them from the complaint – for two claims and not the other eight claims. Finally, allowing a defendant to strike class allegations for some claims would undermine Rule 23(f), which states the "court of appeals may permit an appeal from an order granting or denying class-action certification under this rule." Fed. R. Civ. P. 23(f). The Court should not undermine the Second Circuit's authority to review an order granting or denying class certification by entertaining ill-founded Rule 12(f) motions. If Defendants' arguments concerning class certification have merit, Defendants may raise them when Plaintiff moves to certify the class, which should happen at "an early practicable time after a person sues or is sued as a class representative." Fed. R. Civ. P. 23(c).

## VII.   CONCLUSION

Defendants' motion should be denied. The allegations give rise to a plausible inference that Plaintiff is entitled to relief for its claims against Defendants (with one inconsequential exception, see Part V.A *infra*). Defense counsel may state the Complaint is "patently false" in his brief, but an "attorney's unsworn statements in a brief are not evidence." *Kulhawik v. Holder*, 571 F.3d 296, 298 (2d Cir. 2009). And the undersigned counsel who ***signed*** and verified the Amended Complaint's allegations has ***no doubt*** that the evidence will ***prove*** Plaintiff's claims.

DATED: May 30, 2019

Respectfully submitted,

/s/ *Brian Lehman*

Brian Lehman
Lehman LG LLC
244 5th Ave., B258
New York, New York 10001
(724) 453-4626

*All Counsel Served by*
*CM/ECF*